**Affirmed and Memorandum Opinion filed September 8, 2022.**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00194-CV

**S.L., Appellant**

**V.**

**DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, Appellee**

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2021-20430**

## MEMORANDUM OPINION

This accelerated appeal arises from a final order in which, after a final hearing tried to the bench, the trial court terminated the parental rights of appellant S.L. (Mother) with respect to her daughter A.L.R. (Andie),[1] who was 15-months old at the time of the final hearing, and appointed appellee Department of Family and Protective Services (the Department) to be Andie's sole permanent managing

---

[1] To protect the minor's identity, we have not used the actual names of the child, parents, or other family members. *See* Tex. R. App. P. 9.8.

conservator. *See* Tex. Fam. Code Ann. § 109.002(a-1) (accelerated appeals in parental-termination cases); Tex. R. App. P. 28.4 (same).

This appeal presents a somewhat unusual situation in which Mother has conceded the predicate grounds for termination and, in a single issue, challenges only the factual sufficiency[2] of the evidence to support the trial court's findings in its final order that termination is in the best interest of Andie, effectively acknowledging the legal sufficiency of the evidence to support the final order. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We affirm.

## I.    BACKGROUND

Andie was born in October 2020. When Andie was three months old, Mother tested positive for cocaine and, because Mother had an active termination proceeding related to another child, Andie was removed and placed in foster care. The man that Mother alleged to be Andie's father was never identified or found.[3] The Department sought and received temporary conservatorship over Andie.

A final permanency hearing was held in January 2022, at which the Department sought to have Andie's current foster parents appointed as permanent managing conservators. Mother had made progress on her service plan, and the Department wanted to continue to work with her. Before the final hearing, the attorney ad litem representing Andie's interests filed a counter-petition asserting grounds for termination and that termination was in Andie's best interest. *See* Tex. Fam. Code Ann. § 161.001. The attorney ad litem argued at the final hearing there

---

[2] While Mother did not file a motion for new trial, "[i]n a nonjury case, a complaint regarding the legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief." Tex. R. App. P. 33.1(d).

[3] Andie's presumed father, Q.W., was never found or served. Q.W.'s interests were represented by an appointed attorney at the hearing. The trial court terminated Q.W.'s parental rights, as well as the rights of any unknown father, which has not been challenged on appeal. *See* Tex. Fam. Code Ann. § 161.002.

was clear and convincing evidence establishing that termination of Mother's rights was in Andie's best interest.

The trial court made no oral ruling but took the parties' arguments under advisement. The trial court later signed a final order of termination with findings in its final order (1) on the predicate ground of endangerment, (2) on the predicate ground of failure to comply with the court-ordered family-service plan, and (3) that termination is in the best interest of Andie. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (O), (b)(2). The Department was named as Andie's sole managing conservator.

## A.  Documentary evidence admitted in this proceeding

### 1.  Temporary order following adversary hearing

In February 2021, the trial court found there was an immediate danger to Andie's physical health or safety and that it was contrary to her welfare to remain with Mother. As a result of these findings, the trial court named the Department as the temporary managing conservator of Andie with rights to physical possession of Andie until a full adversary hearing was held.

### 2.  Family-plan evaluation

According to the Department's family-plan evaluation (referred to subsequently as the service plan), which was admitted into evidence at the final hearing, the goal for Andie was to have a safe and stable environment where she could meet all of her developmental and emotional needs and be free from abuse and neglect. The service plan, written by the caseworker, stated the Department "continues to worry that [Mother] is unable to appropriate supervise and care for [Andie] due to her continued substance use."

The plan outlined the required actions for Mother including the following:

3

- maintain safe, stable housing for her children;
- obtain and maintain legal employment for more than six months;
- participate in random drug testing (urinalysis and hair follicle testing);
- attend and complete a parenting class;
- attend and complete a substance-abuse assessment and follow all recommendations for treatment;
- attend and participate in a psycho-social evaluation to address her history of mental health concerns;
- attend and complete counseling session; and
- attend and participate in a domestic violence class to address her history of aggression.

### 3. Prior termination order

The trial court admitted a 2019 court order from a separate proceeding terminating Mother's parental rights to "Jason," now five years old. *See* No. 18-E-0532 (130th Dist. Ct., Matagorda County, Tex. June 25, 2019). The final order regarding Jason included the following findings supporting termination of Mother's parental rights (1) on the predicate ground of endangerment, (2) on the predicate ground of voluntary abandonment; (3) on the predicate ground of failure to comply with the court-ordered family-service plan, and (4) that termination is in the best interest of Jason. *Id.*; *see* Tex. Fam. Code Ann. § 161.001(b)(1)(A) (B), (D), (E), (O), (b)(2).

### 4. No contact order for Jason's father

The trial court admitted a no-contact order granted by the 180th District Court in Harris County in a separate criminal proceeding protecting Mother from any contact with Jason's father. *State v. Rose*, No. 163643201010 (180 Dist. Ct., Harris County, Tex. June 28, 2019).

### 5. Social-media evidence

The trial court admitted Facebook posts from Mother authenticated by a witness who communicated with her on Facebook. Some of the posts were advertisements for the creation of forged government, financial, and employment documents in the 12 months before the final hearing.

## B. Testimony at the final hearing

### 1. CPS caseworker

Child Protective Services (CPS) caseworker A. Debose testified that Andie was placed in foster care because Mother tested positive for cocaine when Andie was three months old. At that time Mother was the respondent in another CPS case involving Mother's two-year old ("Alice").

In the CPS case involving Alice, the Department's concern was that Mother was in a relationship with Jason's father, who had repeatedly committed violent acts against Mother and exposed Mother's children to violence. Mother's rights to Alice were not terminated; however, Alice is currently living with a friend of the family, Mrs. W.

Debose testified that domestic violence was not a concern in this case although on examination she admitted that she had seen Jason's father at Mother's apartment in September 2021. Debose authenticated a photo she had taken in September 2021 in which Jason's father is seen sitting on the patio with Mother at Mother's apartment.

Mother's parental rights to Jason were terminated in 2019. Jason came into care because Mother gave birth to Jason while incarcerated in Bexar County. Jason was taken in by Mr. and Mrs. R (Foster Mother and Foster Father) who ultimately adopted Jason. Foster Mother and Foster Father are currently caring for Andie as

well. Debose testified that Foster Mother and Foster Father were willing to care for Andie long-term even if Mother's parental rights were not terminated.

Debose was not as familiar with Mother's involvement in the lives of her older three children because the Department was never involved with them. She did testify that two of Mother's children were presently living with Mother: five-year old "Mary" and six-year old "Kate."

Debose testified that Mother had not tested positive for drugs in a year, although she had missed several urine tests in the months leading up to the final hearing. She also testified that Mother had not been charged with any new crimes during the pendency of the case.

Debose initially testified that Mother had completed her service plan. However, on further examination, Debose testified that Mother was not presently employed and that she had not complied with the requirement in the plan that she maintain stable employment for six months. Mother provided documentation to Debose reflecting that she obtained employment in a rehabilitation facility in October 2021. However, she was no longer working there as of December 2021.

Debose testified she was aware Mother had an extensive criminal history, and Mother was on probation at the time of the final hearing for two felony convictions.

Debose testified that Andie is doing well in her foster home and all her needs are being met. Reports reflect that Andie is a happy child who is always smiling. Debose testified that Andie is bonded with Foster Mother and Foster Father and that she has also bonded with her brother Jason. She also testified that Mother regularly visited Andie and their visits were appropriate. Debose testified that she felt it was in Andie's best interest to stay in her current foster home.

## 2. Mother

Mother testified that Andie is well cared for with Foster Mother and Foster Father. She had been visiting Andie weekly. Mother also testified that she secured stable housing. Though she is not the lessee, she testified that she was designated as an occupant on the lease.[4] She described that she was learning how to care for her kids and be part of their life.

Mother testified that she never had the opportunity to care for Alice or Jason. However, she testified that Andie was in her care for approximately three months before removal. She also testified that she was Mary's caregiver for several months until she became incarcerated, at which point Mary went to live with Mrs. W. Mother testified she was Kate's caregiver for the majority of Kate's life. However, she acknowledged that Kate had been in Louisiana with her father for the last year and that Kate's great grandmother, before her death, was very involved in caring for Kate. Mother also testified that her oldest daughter, "Briana," has lived with her maternal grandmother for nearly all of her life. Mother was sentenced to prison when Briana was less than a year old, and Briana lived with her grandmother while Mother served her five-year sentence. After she was released, Briana stayed with her grandmother and Mother would come visit with her mother and Briana. Mother testified that Briana intends to stay with her grandmother until she finishes school.

Though none of her convictions were admitted into evidence, Mother testified to her criminal record. Mother has an extensive criminal record beginning in 2007.[5] In 2009, when Briana was a baby, Mother pleaded guilty to burglary of a habitation and was sentenced to five years imprisonment. Since that time, Mother

---

[4] The lease was never admitted into evidence.

[5] Mother was seventeen years old at the time of her first conviction.

has been convicted of a variety of different offenses, mostly theft-related crimes. Mother is currently on probation for two different felony convictions: felony theft and tampering with evidence. Mother has not been charged with any crime since January 2021.

Mother was asked about the Facebook posts which were entered into evidence, and she testified that it was not her Facebook page.

### 3. Foster Mother[6]

Foster Mother testified that she and her husband have been caring for Jason since June 2018. Andie came into their home in June 2021 when Andie was approximately nine months old. She testified that Jason and Andie have bonded tightly. She also testified that Andie had bonded with her and Foster Father.

Foster Mother has known Mother for nearly ten years and has interacted with all of Mother's children. Briana, who is now 13, went to live with her grandmother when Mother went into the correctional system. Foster Mother is also the godmother to Kate. She recalled that Kate has been primarily raised by her great-grandmother but has also spent time with her father in Louisiana.

Foster Mother testified that Mary had been cared for by Mrs. W for almost her whole life along with some help from Mary's great grandmother. When Mother gave birth to Jason in county jail, Foster Mother and Foster Father agreed to take him because there was no one else to care for him. After Mother's parental rights were terminated, they adopted Jason. When CPS became involved with Andie, CPS contacted Foster Mother and Foster Father and asked if they would take her. Andie has been in their house since that time. Foster Mother described Jason as healthy and smart.

---

[6] Foster Father also testified but his testimony was cumulative of Foster Mother's testimony.

Foster Mother testified that she and Foster Father are willing to provide long-term care for both children.

### 4. Family friend

Mrs. W testified that she is currently the caregiver for Alice. Mrs. W was previously married to Alice and Jason's grandfather. Mrs. W has known Mother since 2016.

When Mary was one month old, Mrs. W's daughter brought Mary to her home and Mrs. W began caring for Mary. She testified that Mary lived with her for approximately five years until just a few months before the final hearing. Mrs. W explained that Mother recently asked Mary to attend a birthday party for Briana. Mother picked up Mary from Mrs. W's care, never brought her back and has cut off contact since that time. Mrs. W cared for Mary without any court orders or CPS involvement. She testified that Mary was very attached to her as well her sister, Alice.

In 2019, after Alice was born, Mother left Alice at the hospital and instructed the hospital to call Mrs. W to pick up Alice. She testified that Alice has lived with her since that time.

Mrs. W testified that although Mother was ordered to pay child support for Alice she has only received two payments. She also testified that Mother provided occasional clothing for Mary and Alice, but no other financial assistance.

Mrs. W has communicated with Mother via social media and testified she communicated with Mother using the Facebook profile in evidence.

## II. ANALYSIS

In her appellate brief, Mother concedes "grounds"—the predicate termination grounds found by the trial court. Mother does not raise any allegation

of error with respect to the legal sufficiency of the evidence supporting either the grounds for termination or the best-interest determination. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). In this appeal, Mother challenges only the factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of Andie.[7] *See* Tex. Fam. Code Ann. § 161.001(b)(2). The Department did not file any briefing in this appeal.

## A.    Burden of proof

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."). Given the fundamental liberty interests at stake, "termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

---

[7] Mother does not assert any legal error on the part of the trial court. "A '[f]actual sufficiency . . . [challenge] concede[s] conflicting evidence on an issue' (which made it appropriate for the jury to consider), 'yet maintain[s] that the evidence against the jury's finding is so great[,]' or the evidence for the jury's finding is so weak, 'as to make the finding erroneous.'" W. Wendell Hall & Ryan G. Anderson, *Standards of Review in Texas,* 50 St. Mary's L.J. 1099, 1133 (2019) (citing *Raw Hide Oil & Gas, Inc. v. Maxus Expl. Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied)). Hall and Anderson, in their article, question the status of the factual-sufficiency review in civil cases noting that "the supreme court has not decided a major case that addressed the line between legal and factual sufficiency standards since 2006, and then only in the specialized context of punitive damage awards." *Id*. at 1154–55. Whether a holding that evidence is factually insufficient is reversible error in the underlying trial-court final judgment or final order or is instead a constitutional, separate power to make decisions on questions of fact is something we need not decide in this appeal. *See* Tex. Const. art. V, § 6(a) (factual conclusivity clause).

10

Due to the severity and permanency of terminating the parental relationship, the law in Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *J.F.C.*, 96 S.W.3d at 264.

## B.    Factual-sufficiency review

The authority to conduct a factual-sufficiency review lies exclusively with the courts of appeals. Tex. Const. art. V, § 6(a). The heightened burden of proof in termination cases results in a heightened standard of review. *See J.F.C.*, 96 S.W.3d at 266–67. A proper factual-sufficiency review requires the court of appeals to determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.,* 96 S.W.3d at 266. A reviewing court must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *See A.B.*, 437 S.W.3d at 503. However, the factfinder remains the sole arbiter in assessing the credibility and demeanor of witnesses. *Id.*

Though Mother asserts there was ample evidence her parental rights should not have been terminated, she does not challenge the legal sufficiency of the evidence, acknowledging the conflicting evidence in the record.

## C. Best interest of the child

### 1. *Holley* factors

Mother concedes the predicate termination grounds but challenges the factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in the best interest of Andie. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

There is a strong presumption the best interest of a child is served by keeping the child with a natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing Tex. Fam. Code Ann. § 153.131(b)). However, prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). The considerations the factfinder may use to determine the best interest of the child, known as the *Holley* factors, include:

(1) the desires of the child;

(2) the present and future physical and emotional needs of the child;

(3) the present and future physical and emotional danger to the child;

(4) the parental abilities of the person seeking custody;

(5) the programs available to assist the person seeking custody in promoting the best interest of the children;

(6) the plans for the child by the individuals or agency seeking custody;

(7) the stability of the home or proposed placement;

(8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and

(9) any excuse for the parent's acts or omissions.

*See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to be considered in evaluating "whether

the child's parents are willing and able to provide the child with a safe environment"). A best-interest finding does not require proof of any unique set of factors or limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371–72.

In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest, we are mindful the focus in a best-interest analysis is not only on the parent's acts or omissions, but also on the nature of the relationship the children have with the parent. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012).

## 2. Sufficiency of the evidence

### a. Desires of the child (*Holley* factor 1)

Andie was removed from Mother when she was three months old and was approximately 15 months old at the time of final hearing. When a child is too young to express its desires, the factfinder may consider whether the child has bonded with the foster parents, are well-cared-for by the foster parents, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A child's need for permanence through the establishment of a "stable, permanent home" has sometimes been recognized as the paramount consideration in a best-interest determination. *See In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement is relevant to the best-interest determination. *See C.H.*, 89 S.W.3d at 28.

Here, the evidence reflects Andie was placed with Foster Mother and Foster Father and has been doing well. The caseworker testified Andie was a happy child and doing very well in her foster placement. Andie is living with Jason, her biological brother, and Foster Mother testified that Andie and Jason are bonded. Foster Mother testified she and Foster Father wish to adopt Andie if possible.

The caseworker also testified that Mother had regularly visited Andie. She testified that the visits were appropriate, and Andie bonded with Mother during visitation. Though she did not recommend termination, the caseworker testified that Andie's best interests were served by remaining with Foster Mother and Foster Father.

Mother argues that this factor should be neutral given Andie's age. However, in light of the evidence that she was very bonded to her brother and foster family, as well as her need for stability and permanence, *Holley* factor 1 weighs in favor of the trial court's finding that termination was in Andie's best interest.

### b. Physical and emotional needs of the child and the physical and emotional danger to the child (*Holley* factors 2 and 3)

Though the evidence established Andie had no special needs, she has the emotional and physical needs of all young children.

"Conduct that subjects a child to [a] life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination of parental rights is in the child's best interest. *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re G.M.G.*, 444 S.W.3d 46, 59–60 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (parent's failure to provide stable home and provide for child's needs may contribute to finding that termination of parental rights is in child's best interest).

14

At the time of the final hearing, Mother had complied with one of the service-plan requirements and secured the lease of an apartment. She had been in her apartment for just under a year. Though Mother had stable housing, the evidence at the final hearing reflected that Mother had a history of instability. She had been in and out of the correctional system her entire adult life. While criminal violations and incarceration are not enough to show endangerment by themselves, they can be evidence of endangerment if shown to be part of a course of conduct that is endangering to the child. *See Tex. Dep't of Human Services v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987). Mother's criminal convictions also prevented Mother from having much involvement in the care and upbringing of her older five children. The attorney ad litem representing Andie expressed concern and brought forth evidence reflecting that Mother still had contact with Jason's and Alice's father, who had a history of violent behavior towards Mother, and allowed him to visit the apartment she shared with her children.

Mother argues the evidence that she secured housing combined with the caseworker's testimony that she had no concerns with Mother's housing should weigh in favor of not terminating Mother's parental rights. However, *Holley* factors 2 and 3 are intended to encompass more than Mother's present ability to secure housing. Mother was not employed at the time of the final hearing and had no evidence of stable employment for several years. Mother did not successfully complete her service plan as she was unable to demonstrate stable employment for at least six months. At the final hearing, there was no evidence that Mother had the means or resources to support herself and the needs of her children. Mother was on probation for two offenses at the time of the final hearing, one of which was a 10-year probation which Mother recalls was assessed in 2019. Given Mother's unstable lifestyle and current probations, there was clear-and-convincing evidence

15

reflecting that Mother's lifestyle, instability and long-term probations posed emotional and physical danger to Andie. Though Andie has no special needs, her best interests are served in a stable environment where she can thrive emotionally and physically. We conclude *Holley* factors 2 and 3 weigh in favor of the trial court's finding that termination was in Andie's best interest.

### c.      Parenting abilities and programs available (*Holley* factors 4 and 5)

There is little evidence in the record of Mother's parenting abilities. Briana, her thirteen-year-old daughter, lives with her grandmother and has spent nearly her entire life in her grandmother's care. Though Kate and Mary lived with Mother at the time of the final hearing, Mother testified that Kate has moved around between family members who cared for her. Mother also testified that Mary had spent large portions of her life living with Mrs. W. Both Jason and Alice were removed from Mother shortly after they were born. Andie was removed from Mother when she was just three months old. Testimony from Mrs. W and Foster Mother, who had both known Mother for several years, supported the conclusion that Mother had not been very involved in the day-to-day care for any of her children for any length of time.

Mother argues that she demonstrated her parenting abilities by raising Kate and Mary. However, testimony at the final hearing established that Kate and Mary had only very recently come to live with Mother. Though Mother is seeking an opportunity to prove herself as a parent, the factfinder could have determined from her pattern of conduct with her older children that she lacks the parenting abilities to care for Andie. *Holley* factor 4 weighs in favor of the trial court's finding that termination was in Andie's best interest.

There are programs available to help Mother improve her parenting abilities

16

and find stability such as counseling and parenting classes. Testimony at the final hearing reflects that Mother participated in the required classes and made progress. However, given Mother's history, *Holley* factor 5—the programs available to assist the person seeking custody in promoting the best interest of the child—is neutral with respect to trial court's best-interest determination.

### d. Mother's service plan (*Holley* factor 6)

A parent's performance under a service plan is also relevant to several of the *Holley* factors, including the emotional and physical danger to the child now and in the future, parental abilities, and stability. *Holley*, 544 S.W.2d at 371–72. It is also relevant to many of the statutory factors for determining the best interest of the child: (1) the willingness of the parent to seek out, accept, and complete counseling services; (2) the willingness and ability of the parent to effective positive changes within a reasonable time; and (3) whether the parent demonstrates adequate parenting skills. Tex. Fam. Code Ann. § 263.307(b)(10), (b)(11), (b)(12). Given the connection between a service plan and the *Holley* and statutory factors, a parent's actions with regard to the service plan are relevant to a child's best interest. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2012) ("[m]any of the reasons supporting termination under subsection O also support the trial court's best interest finding"); *see also In re M.G.D.*, 108 S.W.3d 508, 515 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("we believe a parent's recent turnaround and compliance with a family service plan are factors jurors should consider, but not determinative ones. If the facts involved show progress may take a very long time . . . reasonable jurors may conclude that termination is clearly and convincingly in the child's best interest").

Mother made significant progress on her service plan. She completed classes, she secured stable housing, and she had no positive drug tests since

17

Andie's removal. However, Mother was not able to secure and maintain stable employment for six months. She also offered no explanation for why she was unable to find stable employment or how she was supporting herself and her children. This evidence weighs in favor of the trial court's finding and determination.

### e. Current placement of the child (*Holley* factor 7)

The caseworker and Foster Mother testified Andie was thriving in her current placement with Foster Mother and Father. She was living with her biological brother, Jason, who had been adopted by Foster Mother and Father, and the two were bonded. The evidence established Andie's current placement is very stable and loving. Foster Mother testified that she and Foster Father wanted to adopt Andie and raise Andie and Jason together.

Mother argues that this factor is neutral because "preserving and maintaining Mother's parental rights, arguably, would do nothing to disrupt or prevent continued placement with the fictive placement." Therefore, while she concedes that Andie's current placement has provided a stable, loving home for Andie, she argues that termination under these facts is unnecessary and improper. Given that Foster Mother stated that she would continue to care for Andie even if adoption were not an option, we agree with Mother that termination is not necessary for Andie to continue in this placement.

However, *Holley* factors 6 and 7 ask us to consider the stability of the home or proposed placement and the plans for the child. Andie's current placement offers a stable home with parents who are both employed and have demonstrated their ability to provide for and parent young children. *See E.N.C.*, 384 S.W.3d at 808–09 (DFPS "presented no evidence that another family wishe[d] to adopt the children, or that the children's foster parents c[ould] provide for them in a way

18

[their parent could] [ ]not"). The evidence that Foster Mother and Foster Father would like to adopt Andie and raise her with her biological brother weighs in favor of the trial court's finding and determination that termination was in Andie's best interest.

### f. Acts and omissions of the parent and any excuse for those acts or omissions (*Holley* factors 8 and 9)

The final two *Holley* factors consider the acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate and any excuse for the parent's acts or omissions. The evidence addressing *Holley* factor 8 has already been discussed with respect to other *Holley* factors. While Mother was using illegal drugs shortly after Andie's birth, Mother established at trial that she had not tested positive for any illegal drugs since Andie's case opened. However, the evidence discussed above regarding Mother's unstable lifestyle and lack of employment weighs in favor of termination.

Finally, under *Holley* factor 9, we consider whether there was any excuse for Mother's acts or omissions. Mother attributed her lack of previous involvement with her older children to her incarcerations. She did not offer any other excuse for her prior acts or omissions, though we note that Mother had made efforts to comply with her service plan. We conclude this factor is neutral with respect to the question of whether termination of Mother's parental rights was in Andie's best interest.

### g. Analysis

We agree with Mother there is a strong presumption that the best interest of a child is served by keeping the child with a natural parent. *See* Tex. Fam. Code Ann. § 153.131(b). However, that presumption may be rebutted with evidence, as it was here in the final hearing. Further, we are mindful that prompt and permanent

placement of a child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The evidence at the final hearing supports the trial court's finding that termination of Mother's parental rights is in Andie's best interest, including the evidence of the stability of Andie's current placement, Andie's progress in that placement, Foster Mother and Foster Father's intention to adopt Andie, the instability of Mother's life, her criminal history and current long-term probation, as well as the comparative lack of evidence regarding Mother's resources and ability to care for her children. *See In re L.M.*, 572 S.W.3d 823, 838 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("[T]he trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in the child's best interest so that she could promptly achieve permanency through adoption."). Though Mother testified that she had not been charged with any criminal activity or tested positive for illegal drugs during the pendency of the case, there were Facebook posts and testimony by a witness, introduced by the attorney ad litem for the child, that Mother had been advertising the sale of forged government documents in Facebook posts during the pendency of the case. This evidence, although denied by Mother, could have convinced the factfinder that Mother had not made the long-term positive changes needed for Andie's stability and for the benefit of the parent-child relationship. Moreover, Mother's lack of involvement with her older children also supports the finding of the trial court.

Much of the evidence presented to the trial court was in the form of witness testimony, and we are mindful that the trial court is the sole arbiter of witness credibility. *See A.B.*, 437 S.W.3d at 503. Considering and weighing the disputed evidence contrary to the best-interest determination against all the evidence favoring the best-interest determination, giving due deference to the trial court's

20

findings, and after an exacting review of the entire record with a healthy regard for the constitutional interests at stake, we conclude the evidence is such that a factfinder could reasonably form a firm belief or conviction that termination of Mother's parental rights was in Andie's best interest. *See In re A.B.*, 437 S.W.3d at 503; *In re J.O.A.*, 283 S.W.3d at 345. Thus, the evidence is not factually insufficient regarding the trial court's best-interest determination.

We overrule Mother's sole issue.

### III.   CONCLUSION

We affirm the trial court's final order as challenged on appeal.


/s/     Charles A. Spain
Justice


Panel consists of Justices Zimmerer, Spain, and Poissant.

21